# EXHIBIT 1

```
                   UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,        )
                                 )
                  Plaintiff,     ) CASE NO. CR18-226-RSL
                                 )
v.                               ) Seattle, Washington
                                 )
LEO M. DICKERSON,                ) July 19, 2019
                                 ) 10:00 a.m.
                  Defendant.     )
                                 ) REVOCATION OF
                                 ) SUPERVISED RELEASE
                                 )
_____

                VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE ROBERT S. LASNIK
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:        JESSICA MANCA
                            MICHAEL LANG
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


  For the Defendant:        SEAN GILLESPIE
                            Carney Gillespie Isitt PLLP
                            600 1st Avenue, Suite LL08
                            Seattle, WA 98104



  Reported by:              NANCY L. BAUER, CCR, RPR
                            Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov
```

Proceedings recorded by mechanical stenography; transcript produced with aid of computer

1          PROCEEDINGS

2     _____

3          THE CLERK:  Case CR18-226L, United States versus Leo

4     Dickerson.

5          Counsel, please make your appearances for the record.

6          MS. MANCA:  Good morning, Your Honor.  Jessica Manca

7     for the United States.  I'm assisted by Assistant United States

8     Attorney Michael Lang, and to my right is Probation Officer

9     Lasimba Jackson.

10         THE COURT:  Ms. Manca and Mr. Jackson, great to see

11    you.

12         MR. GILLESPIE:  Good morning, Your Honor.  Shawn

13    Gillespie on behalf of Mr. Dickerson, who is seated to my right.

14         THE COURT:  Hi, Mr. Gillespie and Mr. Dickerson.

15         Well, we have a number of supervised release violations

16    that have been alleged, number one, knowingly communicating and

17    interacting with a convicted felon on or about May 20, that

18    convicted felon being Devaughn Dorsey -- one of the many

19    Devaughn Dorsey, Jrs.; Violation No. 2, using marijuana on or

20    about May 3rd of this year; and No. 3, failing to participate in

21    substance abuse assessment.

22         And I understand that the government is willing to dismiss

23    number three, and Mr. Dickerson will admit to one and two; is

24    that right, Ms. Manca?

25         MS. MANCA:  That's right, Your Honor.

1          THE COURT:  And, Mr. Gillespie, you've talked about it

2   with Mr. Dickerson, and that's what he wants to do?

3          MR. GILLESPIE:  That's correct, Your Honor.

4          THE COURT:  So, Mr. Dickerson, you know you have a

5   right to a hearing, where the government would have to establish

6   these violations, one and two, by a preponderance of the

7   evidence, right?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And you're willing to give up that hearing

10  and admit that these two violations, you did them?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Okay.  I will find that Violations 1 and 2

13  have been established, and we can move to the disposition

14  portion of the case.

15      Ms. Manca?

16         MS. MANCA:  Your Honor, as the court is well aware,

17  this is not what I would characterize as a typical case, and

18  it's not what I would characterize as a typical violation

19  hearing.  And I wanted to spend some time today going through,

20  with the court, why we are so concerned about Mr. Dickerson's

21  conduct on May 20th, 2019, and why we believe that a sentence at

22  the high end of the guideline range is appropriate.

23      The court will remember that there were two gun charges in

24  the underlying case; one on January 18th, and one in July of

25  2018.  In the January 2018 case, Mr. Dickerson had a gun in the

 1   car with him, but he also had this birthday card, or a stuffed

 2   dog, that was of significant interest to law enforcement, and

 3   the reason for that was that several of the names on this dog

 4   were sort of a who's who of people involved in drive-by

 5   shootings in the Seattle area around that time period.  One of

 6   those people is Jerrod Marks, also goes by "Hot Rod," and that's

 7   a reference to Holly Hell, also the Crips Squad Blocc of 44

 8   Holly.

 9          Mr. Marks had prior convictions for a drive-by shooting,

10   robbery in the second degree, and he's currently serving a

11   51-month, or thereabouts, prison sentence for unlawful

12   possession of a firearm that had an extended-capacity magazine.

13   He was one of the people at the center of the conflict -- that

14   I've talked so much about -- in the summer of 2017, along with

15   another person who isn't featured in this PowerPoint but is

16   Deautre Dorsey, the younger brother of Devaughn Dorsey, Jr.

17          This is a video that the court has seen filed in the

18   sentencing materials taken in the summer of 2017.

19             THE COURT:  Isn't a video supposed to move, Ms. Manca?

20             MS. MANCA:  That's what I've been told.  It's going to

21   defeat the whole purpose.

22          This is the video where they're rapping about catching a

23   body and staying quiet.

24          This is Sytrel Butler, who also goes by the name of "Cold

25   Trel."  He has prior convictions for felon in possession of a

1    firearm and attempted drive-by shooting.

2        The court, I'm sure, has seen the materials regarding the

3    November of 2017 case, where he was both the victim of a

4    drive-by shooting and had a firearm that was associated with the

5    drive-by shooting.

6        This is a photograph produced in discovery of Mr. Dickerson

7    and Mr. Butler flashing the "4," for "44 Holly," and this is the

8    video of them in the car together -- which, likely, also will

9    not play -- in the November of 2017 period.  Along with this

10   video from the Kent case, in Kent 18-739, this is Deshawn West,

11   who has prior convictions for assault in the second degree with

12   a firearm, and Sytrel Butler is driving the car.

13       So you can imagine the government's concern when, given

14   Mr. Dickerson's history of associating with violent felons,

15   possessing guns, and, perhaps even more importantly, moving

16   guns, transferring them from person to person, that he ends up

17   in a car with Devaughn Dorsey, Jr., who has prior convictions.

18   He's currently serving a sentence for felon in possession of

19   ammunition arising out of a shooting investigation, where he

20   himself was actually shot on April 22nd, 2017; prior convictions

21   for robbery in the first degree with a firearm; and felony

22   harrassment with a firearm.

23       But of, perhaps, most significance to the public safety

24   concerns and the concerns of the government, Mr. Dorsey was

25   himself shot in the head on April 20th, 2019.  It was a grazing

1    wound.  Thankfully, he's okay.  But that's a concern when he,

2    having recently been shot, is in a car with multiple firearms.

3          One can imagine -- Mr. Dorsey was not only shot and they

4    were driving in a car at 3:00 a.m. with three guns, two of those

5    guns were stolen in a burglary of a gun store about three weeks

6    earlier.  Two of those guns had been used in other shootings,

7    and two of those guns had been used in other shootings in areas

8    other than Seattle, and one of those guns had been used in a

9    shooting that took place only two hours earlier, when

10   Mr. Dickerson was actually hanging out with the shooter.

11         This is Leo Dickerson.  He is not just glamorizing and

12   rapping about this life, he is living it, and that is a

13   important distinction.  One of Maya Angelou's most famous quotes

14   is, "When someone shows you who they are, believe them the first

15   time."  This is the Leo Dickerson, but it's not the only Leo

16   Dickerson, and that's also an important distinction.

17         At Devaughn Dorsey's sentencing hearing about a year and a

18   half ago, his uncle said to the court that "There is not one

19   truth, there are many truths."  And I thought that statement was

20   so profound that it stuck with me all this time.  That you can

21   have a situation where this is Leo Dickerson, and then I also

22   believe that he is a person who suffers from debilitating

23   depression and PTSD.  I think he was honest with the court when

24   he said that he loves his son more than anything and doesn't

25   want to spend his son's childhood behind bars.

1        The problem is that these Leo Dickersons are both real, and

2    they cannot coexist.  They are in conflict with each other.  And

3    he needs to decide which Leo Dickerson he wants to be, because

4    he cannot be both.  There is no middle ground.

5        And whether he is in custody for seven more months, as the

6    government is recommending or he's released today, I hope he

7    really thinks about that, really thinks about that.

8        At the sentencing hearing in this case, in February of

9    2019, this court said it was giving Mr. Dickerson one shot.  The

10   court gave him that shot, and he didn't take it.  And he's,

11   actually, now getting two shots, because there is a life on the

12   other side of whatever sentence the court imposes today.

13       His situation is different from Mr. Abdullahi, who had --

14   the longest sentence he ever served was 18 months, and now he is

15   looking at 18 years, and he's out of breaks.

16       Mr. Dickerson is going to get another shot, but I think he

17   should leave this proceeding with a better understanding that

18   his actions have consequences.

19       The message that he received after the last sentencing

20   hearing was that this was no big deal, and that's not the

21   message that this court was trying to send, but that's the

22   message that he received.  And he needs to understand that this

23   is, in fact, a very big deal, and his years of sliding over the

24   radar are over.

25       This isn't about associating with felons, and this isn't

1    about spending a weekend with a friend.  This is about

2    associating with a particular type of felon, under a particular

3    type of circumstances, when he knows Devaughn Dorsey's history,

4    when he knows his own history.

5        As a community, we absolutely cannot risk Mr. Dickerson's

6    toxic associations and conduct, making the same choices again

7    and again and again.  It is simply too dangerous.

8        We believe that the court has a duty to protect the public,

9    and that's why we're recommending nine months in this case.

10            THE COURT:  Thanks very much, Ms. Manca.

11       Mr. Jackson, are you the supervising probation officer?

12            THE PROBATION OFFICER:  I'm not, Your Honor.

13            THE COURT:  You're sitting in for somebody, like you

14   did yesterday?

15            THE PROBATION OFFICER:  Correct.

16            THE COURT:  All right.  Thanks.

17       Okay.  Mr. Gillespie?

18            MR. GILLESPIE:  Thank you, Your Honor.

19       The government here makes a lot out of evidence that is

20   unrelated to the actual violations alleged and admitted here,

21   and does so seemingly to relitigate the original sentence in

22   this case.

23       It also heavily implies that Mr. Dickerson was involved in

24   the shooting in Kent on the early morning of May 20th, and it

25   does so based primarily on evidence that involves grainy

1   security footage through a partially open window of a moon roof

2   to Mr. Abdullahi's car, and, through that window, it claims to

3   have perceived some sort of movement or gesture that suggests

4   that Mr. Dickerson might have been in the back of that car that,

5   45 minutes later, was involved in a shooting.

6         I mean, first of all, it should be clear that the shooting

7   for which Mr. Abdullahi has been charged appears to have been

8   entirely motivated by some sort of girl dispute between

9   Mr. Abdullahi and the person that he shot.

10        And it should also be clear that Mr. Dickerson has not been

11  alleged to have any motive related to that -- to being involved

12  in that shooting.

13        As well, the government has neglected to present some

14  additional evidence that could be very useful to the court in

15  determining whether or not Mr. Dickerson actually was likely in

16  the back of that car at the time of the shooting, which

17  Mr. Dickerson denies.

18        The government has detailed cell phone data from Mr.

19  Abdullahi's cell phone that the Bellevue Police were tracking at

20  the time of the shooting.  It's provided a summary, but we don't

21  know precisely where he was at all times, and that would shed a

22  lot of light on information that could vindicate Mr. Dickerson

23  in this case.

24        Furthermore, the government has -- or police seized the

25  phones of Mr. Dorsey and Mr. Dickerson.  Presumably on those

 1    phones, there's evidence that would vindicate Mr. Dickerson, but
 2    we haven't seen it yet.
 3         And then, finally, getting back to the Jack in the Box
 4    video that supposedly implicates Mr. Dickerson, what we have is
 5    a video in which Mr. Abdullahi is driving his car.  Pretty
 6    clearly in the video, he is at this Jack in the Box for about
 7    ten minutes.  There's somebody in the passenger seat.  The
 8    person in the passenger seat appears to be wearing the same
 9    shirt that Mr. Dorsey was wearing when they got detained some
10    two and a half hours later.
11         We see the two sit there, waiting for their orders at the
12    Jack in the Box for about ten minutes.  They received two
13    drinks, and they received two packages of food.  That suggests
14    that there were likely just two people in the car, yet the
15    government has implied that Mr. Dickerson was involved because
16    maybe Mr. Abdullahi makes a gesture towards the backseat that
17    can be seen through a partially open moon roof.
18         Essentially, what the government has done, it's found hoof
19    prints and concluded that there was a zebra, and I don't think
20    that's supportable.  I don't think that's the kind of evidence
21    that should be used to decide Mr. Dickerson's fate in this case.
22              THE COURT:  I'm not going to sentence him for the
23    shooting or being associated with the shooting.  What he
24    admitted to me is that he knowingly communicated and interacted
25    with a convicted felon, Devaughn Dorsey, on or about May 20,

1   where he was stopped in a car, where there were guns and felons.

2   That is exactly what I told him not to do and what he promised

3   me he would not do.  And I said to him, "I know it's hard out

4   there, and I know sometimes you may be tempted to go with these

5   people who are your friends and be in situations.  You've got to

6   promise me you're not going to do it," and he said, "Absolutely,

7   I promise you, Judge, you can count on me.  I'm not going to do

8   it," and he did it.  That's what he's here for.

9           MR. GILLESPIE:  I'm sorry, Your Honor.

10          THE COURT:  So that's what you need to address for me.

11      I gave him an incredible break.  I told him it was a

12  one-shot deal, not a "come back to me again and promise me again

13  and I'll" -- it's like what -- I won't say his name, you know,

14  but one of our presidents said, "Fool me once, shame on you;

15  fool me twice, I won't get fooled again."  He should have said,

16  "Shame on me," but he forget the punch line.  I'm not going to

17  be fooled again, because if it happens twice, it's shame on me.

18      And, you know, unfortunately, Mr. Dickerson has hit a week

19  where I've been really disappointed by a number of people I gave

20  incredible breaks to.  Last Friday I had a woman in front of me.

21  Her guideline range was eight to ten years, and I gave her five

22  years of probation on the condition that she did this, this, and

23  this, and she went right back to the same kind of drug

24  involvement with the Sinaloa drug cartel, and even though she

25  was pregnant, I sent her to prison because, you know, I can't

1   give out these breaks over and over and over again.

2        So that's what you need to focus on, Mr. Gillespie.  What

3   do I do with what Mr. Dickerson did in terms of violating my

4   trust when I gave him credit for time served and put him on

5   supervised release?

6            MR. GILLESPIE:  Your Honor, it's maddening that

7   Mr. Dickerson and others are given opportunities, and they fail.

8   And it's part of life.  It's what, frankly, was suggested -- the

9   kind of behavior that might be suggested from the psych report

10  that was provided by his attorney at the time.

11       He's not perfect.  He is doing his best.  He, frankly, grew

12  up with people who fit the definitions of those around whom he's

13  not supposed to spend time, and it's difficult for him.

14       He never knew Mr. Abdullahi beforehand, so he didn't know

15  whether or not he was a felon.

16       As for Mr. Dorsey, lifelong friend.  There was an exchange

17  at the sentencing hearing.  It actually pertained to the

18  question of whether or not he could hang around with gang

19  members, and Your Honor made an exception for family.

20  Mr. Dickerson, frankly, perceived Mr. Dorsey as family, based on

21  their lifelong history together as friends, and that's where it

22  came from.  That's where the mistake was made.  He's trying.

23  And he only has so much, sort of -- he only has so many personal

24  skills that he can bring to bear, and he's trying to learn more.

25       He made the effort to get the assessment that will work

1   with his drug problem and his other mental health issues.  And

2   it's not going to be an easy fix.  It's like the child that --

3   well, I know I have one to whom I've said time and time again,

4   "I just told you to stop doing that."  It's absolutely

5   maddening.

6            THE COURT:  Yeah.

7            MR. GILLESPIE:  But at the same time, it's what we

8   have to deal with when we're talking about a particularly young

9   man.  Yes, he's legally an adult, but barely so.  And,

10  furthermore, he comes from an environment which, as Dr. Gerlock

11  concluded in her assessment of him, stunted his growth mentally

12  and socially.

13       And so he's trying, but he's not going to be perfect.  And

14  the court, while very empathetically, giving him that break the

15  first time, also needs to understand that he -- he only has so

16  much to bring to the situation, and he's trying to do better,

17  and he can do better.

18       And the same thing goes for the marijuana violation.

19  Lifelong marijuana user; abstained for a couple of months.  He

20  slipped up.  He was self-medicating.  He got caught.  He

21  admitted it, and he continued -- he resumed abstaining from it.

22  It's going to be one step forward --

23            THE COURT:  It isn't the marijuana thing.

24            MR. GILLESPIE:  Of course.

25            THE COURT:  I think I told Leo that I don't expect

1   perfection.  Marijuana, that's an old habit.  But being in a car

2   with Devaughn Dorsey and firearms, that's a whole other area.

3          I think Mr. Dickerson wants to talk to me.  Can he join you

4   up there and tell me what's up?

5                MR. GILLESPIE:  Absolutely, Your Honor.

6                THE COURT:  Great.  And you can talk after him, but --

7                MR. GILLESPIE:  Okay.

8                THE DEFENDANT:  Your Honor, I'm going to start off by

9   saying I feel less of a person by even being here in your

10  presence again, because I told you, out of my mouth, that I

11  wasn't going to mess up.

12         But honestly, honest to God, I had no idea there was any

13  firearms in that car.  If I did, I would have walked.  I'd

14  rather walk than be in front of you again.

15               THE COURT:  Uh-huh.

16               THE WITNESS:  And I feel -- I feel horrible for even

17  being in your presence, even wasting any of you guys' time.  You

18  know, and I'm a man before anything, and you're a man before

19  anything, and I gave you my word, and I messed up.  I'll be

20  honest with you, I did that.  But this is absolutely not who I

21  am, Your Honor.  I've been through a lot in my life.

22         Just when I got out, I lost -- I lost -- my two little

23  cousins got shot multiple times; almost lost their life.  I

24  didn't go pick up a gun and go do something crazy.  Instead, I

25  sat back, and I messed up, and I hit some weed.  That's what I

1    did.  I'll be honest with you, I did.  Yes, I did that.

2         But all this other stuff, I did it, and I'm not proud of it

3    at all.  I'm not proud of none of -- anything she just showed

4    you, I'm not proud of it.  I don't glamorize it.  I don't do

5    none of that no more.  That's not who I am.  That's not who I

6    want to be.  You understand?  I want to change and be somebody

7    else, and I'm not -- I'm not that person I was when I first came

8    in front of you.

9         Me doing these two months I did already in here, it's

10   already -- it's already working on me.  I can't do it, Your

11   Honor.  I mean, your decision is your decision, I have to live

12   it with, but it's not me, Your Honor.  I did everything you

13   asked me to do.

14        I tried to get the drug and alcohol assessment.  I tried to

15   get a job.  I'm only doing so much, Your Honor.  I have a whole

16   lot of people depending on me.  I have a son I have to look

17   after, and I have -- there's a whole lot on my plate, more than

18   I think I can handle, but as a man, I'm going to stand on my own

19   two feet and try my hardest to do what I got to do.

20             THE COURT:  So even if you didn't know this Abdullahi

21   guy, you know Dorsey enough to know that if you're with him at

22   midnight or at 1:00 in the morning or wherever, he likely has a

23   gun on him.  That's who he is.  That's who his father, that's

24   who his brother is, that's who he is.

25             THE DEFENDANT:  Your Honor, listen.  I don't -- I

 1   mean, I didn't see no firearm.  I didn't see one.  And I'm not

 2   going to lie.  I didn't even ask if there was one in there.

 3              THE COURT:  Right.  You need to ask.

 4              THE DEFENDANT:  I understand that.

 5              THE COURT:  You need to not be with him at all,

 6   because I said no gang members.

 7              THE DEFENDANT:  And I'm sorry, and that was my

 8   mistake.  But what I interpreted from what you said, it's

 9   family.  Me and Mr. Dorsey played little league football

10   together.  I know his mom.  He know my mom.  I look at him like

11   that's my cousin.  Blood couldn't make us any closer at all.

12   Blood can make us no closer than where we are.

13       But now I understand -- I understand the severity of the

14   situation.  And I'm not taking none of this lightly.  I

15   understand everything now.

16       At first -- I'm not going to lie -- I knew it was real, but

17   I didn't know the severity of it, and I know the severity of it

18   now, Your Honor.  I know what I have to do, I know what I don't

19   need to be doing, I know what I need to do, and I'm going to try

20   my best to do it, whatever your decision is.

21              THE COURT:  Okay.  All right.

22       I'm not sure I said it to you last time, but there was a

23   very profound moment in my courtroom, where a guy was sitting

24   right where you are, and he told me, he said, "Judge, I prayed

25   to God to protect me from my enemies, and I started to lose all

1    my friends." Do you understand what he was saying?

2              THE DEFENDANT: Yes.

3              THE COURT: Devaughn Dorsey is not your friend. He

4    may be your cousin in terms of you grew up together and played

5    football together, but he doesn't have your best interest in

6    mind. He's all about himself, and you need to protect yourself

7    from people like that. That's what this guy was telling me. "I

8    prayed for God to protect me from my enemies, and I started to

9    lose my friends." They're not real friends. They're enemies.

10             Now, you've got to pull it together. And, you know, you

11   can look at it and say, "Devaughn and I, we're like cousins,"

12   but if you take that attitude, you're going to be right back in

13   front of me.

14             And I said to you at the time -- let me just finish -- I

15   said to you at the time, "I know it's tough out there." It is

16   tough out there. Believe me, Mr. Dickerson, I have tremendous

17   amount of empathy for what you went through. I love the fact

18   that you have a spirit in you. You're not dead inside. You

19   want to do well, you want to be a great dad, you want to be

20   somebody who you can be proud of, let alone the people around

21   you. That's why I see so much hope in you. But you just can't

22   put yourself in these situations.

23             Go ahead.

24             THE DEFENDANT: I understand that, Your Honor. And I

25   know that, in order for me to do my best, I have to cut some

1    people off.  And I have a really big heart, so it's -- it's kind

2    of hard, but I know, in order for me to do what I have to do for

3    my son, then I know I have to do what I have to do.  I mean,

4    hey, I got to do it, and I understand if it's cutting Mr. Dorsey

5    off and cutting even some family members off, if that's what I

6    got to do, then I'm more than willing to do it.  I have no

7    problem doing it, because I don't like the situation that I keep

8    ending up in.  It's nerve-racking.  It drives me crazy.

9            THE COURT:  Okay.  Thanks, Mr. Dickerson.

10       Anything else, Mr. Gillespie?

11           MR. GILLESPIE:  Your Honor, I just wanted to briefly,

12   sort of, paraphrase what I think Mr. Dickerson is getting at,

13   and that's that -- I think he walked out of here last time

14   intending to do well and believing that if he could just stay

15   out of trouble himself, he would stay out of this courtroom.

16   And I think what's really been made clear to him, in this

17   situation, is that he doesn't necessarily have to do anything

18   wrong himself.  By being in the orbit of these folks, he can end

19   up back in jail and back in this courtroom, and I think that

20   point has been made concretely and emphatically to him at this

21   point, and I do believe that the two months he has spent in

22   detention has only reinforced that.

23           THE COURT:  So you think I should just give him credit

24   for time served and put him back on supervised release?

25           MR. GILLESPIE:  That's what I'm asking.

1          THE COURT:  All right.  Thanks, Mr. Gillespie.  I

2    appreciate it.  And thank you, Mr. Dickerson, for the honesty

3    and forthrightness with which you approached me.

4         Mr. Dickerson will have another opportunity, but not until

5    he gives me the time that he owed me from before, plus this,

6    which is a total of nine months.

7          So I am going to revoke the supervised release, impose a

8    sentence of nine months in custody, followed by a new term of

9    supervised release of 27 months, with the prior conditions that

10   existed before.  There are no additional conditions for

11   supervised release that are being recommended, are there,

12   Ms. Manca?

13          MS. MANCA:  There is the one about associating with

14   known gang members previously contained an exception for family.

15   Under the circumstances, we'd ask that the condition remain as

16   proposed with just "no gang members."

17          THE COURT:  No association with any gang members.

18          MS. MANCA:  Right.

19          THE COURT:  I'm afraid that's another price you're

20   going to have to pay, because I can't have you defining "family"

21   in such a broad way.

22         Okay.  You can show that to Mr. Gillespie, and I'll sign

23   it.

24          THE COURT:  Mr. Lang, are you here because you're

25   doing some of the related cases?

1          MR. LANG:  Yes, Your Honor.

2          THE COURT:  The actual --

3          MR. LANG:  Those broader cases we're looking at, yes.

4          THE COURT:  Okay.  Ms. Manca, you may approach.

5     Ms. Manca is your supervisor on this?

6          MR. LANG:  Yes.

7          MS. MANCA:  I'm tech support.

8          MR. LANG:  I'm a bit rusty, Your Honor.

9          THE COURT:  All right.  I have signed the judgment in

10    the case.

11        Mr. Dickerson, don't give up.  I know it's hard in there,

12    but you've got to pay the price.  But when you come back out,

13    you show Probation and you show me that you really are going to

14    make an extra, extra effort.  And we'll start a clean slate next

15    time.  I'm not holding this against you.  It isn't that you so

16    much disappointed me, but I think you disappointed yourself.

17        Everyone in this courtroom is rooting for you.  I guarantee

18    you.  Everyone really wants you to make it.  We all want you to

19    make it.  What you talked about, the big heart, it's very

20    obvious that you have a big heart, and you have a lot of good

21    you can do for people.  And, again, I know it is not easy out

22    there.  People are going to be pulling on you, "Come on, Leo,

23    don't you remember we've got this history together?  Just come

24    from me.  I'm not doing anything wrong.  What's the matter with

25    you?  What have you turned into?  Why are you turning your back

1   on your homeys?  Come on."  You've got to be strong.

2        Thanks very much, counsel.  We'll be adjourned.

3             (The proceedings concluded at 10:33 a.m.)

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


        Dated this 19th day of April 2021.


        /S/  Nancy L. Bauer

        Nancy L. Bauer, CCR, RPR
        Official Court Reporter